1            UNITED STATES DISTRICT COURT

2              DISTRICT OF CONNECTICUT

3    EDWARD BROWN, AND            NO.:  3:01CV2374 (CFD)
     JEFFREY MENARD
4
            Plaintiffs
5    VS.

6    TOWN OF STONINGTON, ET AL

7          Defendants            MAY 22, 2003

8

9

10            DEPOSITION OF EDWARD BROWN

11

12   APPEARANCES:

13          For the Plaintiffs:

14            LAW OFFICE OF WARREN MILLER
                 One Union Plaza, 2nd Floor
15               P.O. Box 116
                 New London, CT  06320
16            BY:  R. EDWARD PHILLIPS, ESQUIRE
                 860/444-0437
17

18          For the Defendants:

19            HOWD & LUDORF
                 65 Wethersfield Avenue
20               Hartford, CT  06114-1190
              BY:  BEATRICE S. JORDAN, ESQUIRE
21               860/249-1361

22

23            HEATHER J. WALSH
           LICENSED SHORTHAND REPORTER
24            Lic./Reg. No. 00226

25

1      A     No.

2      Q     And why had you gone to the Stonington dock and

3    beach area on June 29, 2001?

4      A     I did not go to the dock.  I don't know why you

5    keep mentioning the dock.  I did not go to the dock.

6      Q     Why did you go to Stonington on June 29, 2001?

7      A     To go scuba diving.

8      Q     Where were you intending to go scuba diving?

9      A     At the beach by the dock.

10     Q     Does the beach have a name?

11     A     I do not know the name.  There's some kids playing

12   in the picture I have, but I don't know the dock, the beach

13   I should say.

14     Q     Okay.  Can you just describe for me what the area

15   looks like?

16     A     Yes.  It's sandy.  There's a lot of white sand,

17   and there's a bench to the right of the sand, and there's

18   rocks along the sandy beach to the water.  And the sign has

19   -- there is a sign located in front that says "Shoreline

20   public access."

21     Q     Okay.  Are you referring to specific photographs

22   in describing the area that you were in?

23     A     Yes.

24         MS. JORDAN:  Okay.  Can we go off the record for a

25         minute?

1    point area where you were watching the boats?

2        A    No, we weren't watching boats.  I went to do a

3    dive, scuba diving.

4        Q    You indicated when you first arrived you went down

5    to a point area.

6        A    Oh, the point, Stonington Point.

7        Q    Right.  That's where you went first when you

8    arrived in there?

9        A    Correct.

10        Q    You went to Stonington Point.  And what were you

11    doing there?

12        A    Watching boats.

13        Q    Okay.  And at some point you left the Stonington

14    Point area, correct?

15        A    Correct.

16        Q    Okay.  And is that when you went to this beach

17    area, or did you stop anywhere else?

18        A    Nope, right there to the beach.

19        Q    Okay.  Now, in your drawing, which is marked

20    Defendants' Exhibit 15, you indicate that you parked in a

21    parking lot which is to the left of the entrance marked on

22    the drawing; is that correct?

23        A    Correct.

24        Q    Okay.  And you also have depicted in this sketch a

25    box that says "Parking."  Is that the location of where you

1    inside the light.  I have a dive light.  I put the gauge

2    inside the lens.  There's a plastic casing, and I shoved it

3    in there so I could have the lens right on the light.  That

4    was brought down to the beach.  The dive bag, fins,

5    snorkel.

6        Q    Now, what was Jeffrey Menard doing while you

7    were -- you know, when you went down to the water the first

8    time and came back?

9        A    I think he walked into the water up to his waist,

10   and he came out.  The water was murky, a little bit murky

11   farther out up to his waist, and he looked in.  It could

12   have been from me walking in, stirring the bottom, but he

13   walked in, walked out, sat on the bench, drinking his soda.

14       Q    He sat at a bench in the area?

15       A    Yeah, next to the beach.

16       Q    Okay.  And what was Jeffrey Menard doing when you

17   proceeded back down to the shoreline the second time with

18   the remainder of your equipment?

19       A    Sitting on the bench, drinking a soda.

20       Q    Now, was there anyone else in this beach area that

21   you were in at the time?

22       A    No.

23       Q    Could you just go through the photographs that

24   you've provided to me that have been marked Defendants'

25   Exhibits 1 through 9, I believe, and just indicate which

1    photographs, if any, show the parking area in which you

2    parked?

3        A    I'm trying to make it out.  Let's see.  I was

4    parked over in here, in the parking lot.  I was parked over

5    this way more, if I can get a closer shot.

6        Q    Could you just --

7        A    I believe I was parked right here, where that blue

8    vehicle is now, right there I was parked, and this is the

9    playground.  I was parked right there.

10       Q    Okay.  Can I take a look at that?  You're

11   referring to Defendants' Exhibit 6, and you're indicating

12   that you were parked where --

13       A    Let me see.

14       Q    The blue car, you said?

15       A    Let me see the pen.

16           MR. PHILLIPS:  Don't mark on the photograph.

17           THE WITNESS:  Right here.  This vehicle right

18       here.  Can you see that vehicle?

19   BY MS. JORDAN:

20       Q    The second vehicle from the left side?

21       A    The second vehicle in.

22       Q    Okay.  Just going back to Defendants' Exhibit 6,

23   can you point to the direction in which this beach area

24   that you were in was located, related to the parking area?

25       A    Right here (indicating).

1    Q    So you're pointing to the area directly behind the

2  vehicles?

3    A    To the left of where I parked.  There's the beach.

4  If you're looking at this and this, you could see there's

5  the house, there's the beach.

6    Q    Okay.

7    A    To the right of the house is the beach.

8    Q    Okay.  In the photograph Defendants' Exhibit 6, it

9  looks like there's a sign protruding over that vehicle

10  which you indicate you parked in.

11    A    Yeah.

12    Q    Is that the boating sign that you recalled seeing?

13    A    Correct.

14    Q    Okay.  Now, you indicated that when you went down

15  to the shoreline with the remainder of your equipment,

16  Jeffrey Menard was sitting on a bench?

17    A    Correct.

18    Q    Did Jeffrey Menard stay on the bench the entire

19  time, do you know, that you could see him?

20    A    He was watching me do a dive.  I was diving where

21  he could watch me in case something happened.

22    Q    Okay.

23    A    If I got hurt.  I was diving alone.

24    Q    Okay.  What did you do after you got to the

25  shoreline with all of your equipment?

1      A    Felt how cold the water was, checked all my

2  equipment.

3      Q    And then what did you do?

4      A    Checked the equipment and blew up the BC on the

5  vest.

6      Q    Okay.

7      A    And, let's see, checked my air and the regulator

8  to the tank, second-stage regulator, and took the mask off

9  and rinsed it with the water to get the mask the same

10  temperature as the ocean so even with the Sea Drops it kept

11  it so it doesn't fog up, and walked backwards into the

12  water from the beach into the water.

13      Q    Now, how long were you at the shoreline doing all

14  of this?

15      A    It takes 15 minutes to get suited up.

16      Q    Okay.  So roughly 15 minutes before you went back

17  into the water the second time?

18      A    Yeah.

19      Q    Okay.

20      A    Not 15 minutes between going into the water and

21  coming out, but --

22      Q    Fifteen minutes from the point that you actually

23  got back to the shoreline the second time before you went

24  into the water?

25      A    Not 15 minutes, no.

NIZIANKIEWICZ & MILLER

1    Q    No?

2    A    Three minutes.

3    Q    Okay.  Now, you indicated that you'd arrived at

4    about 8:00 o'clock.  Was it still light out when you were

5    at the shoreline putting on the final bits of your

6    equipment?

7    A    Correct.  It wasn't pitch dark yet.

8    Q    The sun had set?

9    A    Just starting to, I believe.  It was still a

10   little light.

11   Q    Okay.  Do you know how long you had been in the

12   water?

13   A    Roughly 45 minutes.

14   Q    So you did about a 45-minute dive?

15   A    Yes.

16   Q    During the 45-minute dive, had you surfaced at

17   all, or were you able to see what was going on on the

18   shore?

19   A    I can't remember.  I was doing a dive.  I was

20   under water 35 feet.

21   Q    Okay.  So you were under water, as best you can

22   remember, about 45 minutes?

23   A    Roughly 40 minutes, along the wall, not past the

24   point of the wall.

25   Q    Of that rock wall that you indicated?

NIZIANKIEWICZ & MILLER

1      A    (Nodding head.)

2      Q    And what happened after your 40- or 45-minute

3  dive?  What happened then?

4      A    I was low on air, and I was starting to get

5  vertigo.  When I started to surface, it was dark, the water

6  was dark, and I wasn't sure of where the surface was.  I

7  had to look at the bubbles as I exhaled to know where the

8  surface was.

9      Q    What happened when you got to the surface?

10     A    I surfaced, and there was a bright light in my

11  eyes.

12     Q    And then what did you do?

13     A    I -- whoever it was, I told them to get the light

14  out of my eyes.  I actually swore.  I said, "Get the f'n

15  light out of my eyes."  But I was, you know, getting

16  vertigo, where I didn't know where the surface was.  And my

17  fins were stirring the silt up, so when I surfaced, it was

18  murky; and I had water in my ears from the hood, so I

19  couldn't hear.  My ears were clogged with water.

20     Q    Do you know who was shining the light in your

21  eyes?

22     A    No.

23     Q    What did you do then?

24     A    I said, "Get the light out of my eyes."

25     Q    Okay.

NIZIANKIEWICZ & MILLER

36

1       A     And I was going to go back down and do another

2 dive. It's easier for me to swim under water than on the

3 surface with a dive tank and weight belts and everything.

4 Water was in my ears with the hood on, so I couldn't really

5 hear that well. It was like having a wad of tissue in both

6 my ears. Someone had a light in my eyes.

7       Q     All right. You've already indicated that someone

8 was flashing a light in your eyes, and you told them to get

9 it out of your eyes. What I want to know is what you did

10 then.

11       A     What did I do then. I was up on like a -- I was

12 by the wall, maybe off the wall about maybe 25, 30 feet

13 away from the wall. I was on the surface, and I was -- the

14 light was still in my eyes, you know. I was opening my

15 hood and taking the water out of my ears.

16       Q     And then what happened?

17       A     Then there was a guy on the rock wall, and he said

18 that I was under arrest.

19       Q     Did he say anything else to you?

20       A     He said, "Get out of the water."

21       Q     Okay. Can you explain what happened then?

22       A     I asked him what for, and he said I'm under

23 arrest, and I says, "You haven't told me what I've been

24 arrested for," and he says -- I noticed -- I noticed at

25 that time that it was a police officer, and I had told him

NIZIANKIEWICZ & MILLER

1    that I'm diving for lobsters and I have a plate in the

2    windshield of my truck, Connecticut Fish, I have a permit

3    to dive for lobsters in Stonington, or in Connecticut,

4    Connecticut license.

5        Q    Now, you indicated that at some point you noticed

6    it was a police officer?

7        A    Correct.

8        Q    How did you come to notice it was a police

9    officer?

10       A    He had taken the light out of my eyes momentarily

11   when I moved away to get the light out of my eyes.  I moved

12   my head away, and I could notice that he was a police

13   officer.

14       Q    Do you know the name of this police officer?

15       A    No.  I think -- I can't -- I needed the pictures

16   to recognize the officers, and I still have not received

17   them.

18       Q    Do you know, as you sit here today, the name of

19   the police officer?

20       A    I know the names of some of the police officers,

21   but I do not know the name of the officer at that time,

22   what I had seen.

23       Q    Okay.

24       A    I noticed a uniform and a badge.

25       Q    Were you able to see what this police officer

NIZIANKIEWICZ & MILLER

1    looked like?

2        A    Roughly.  I have a description of what he looks

3    like.  I know what he looks like.

4        Q    And what does he look like, or what do you recall

5    him looking like?

6        A    A thin guy.  I need the pictures.  I need the

7    pictures to look at them.  He was on the rocks.  It was

8    dark.  He had a short haircut and a thin face, and he was a

9    younger guy, and he was shaved.  He had a short haircut.

10       Q    And what did you do after he told you to get out

11   of the water?

12       A    I told him that if I was under arrest, that I was

13   letting the lobsters go, and I told him that I'm letting

14   the lobsters go and proceeded to release four lobsters that

15   were in the dive bag.

16       Q    Why did you tell him that you were going to let

17   the lobsters go?

18       A    Because I told him if I was under arrest, I was

19   letting the lobsters go.  They would die.  They would die

20   on me if I got brought down to the police station and had

21   them sit in the car, in the hot -- in the hot truck.  They

22   would die, and I couldn't eat them, I'd get sick.  I let

23   them go.

24       Q    And did the police officer say anything to you

25   while you were letting the lobsters go?

1       A    He kept screaming as loud as he can in a

2   high-pitched voice, screaming and screaming that he was --

3   that I was letting the lobsters go, letting the lobsters

4   go, to a guy, another guy at the beach.  I think it was

5   another officer on the beach where I entered.

6       Q    Did he say anything else?

7       A    It was like he was gonna jump in the water from

8   the rocks and try to catch me.  He was moving his hands

9   like this, as he was going to jump in the water after me,

10  and I told him that I'm legally diving for lobsters and I

11  have a permit in the truck.  I repeated that to him, and

12  that was in a soft tone.  After I recognized that he was a

13  law officer, I told him that I was legal and I wasn't doing

14  anything wrong.  He got very loud and very agitated.

15      Q    Did he instruct you at all not to let the lobsters

16  go?

17      A    I can't remember.

18      Q    You told him you were going to let the lobsters

19  go.  You opened your bag, and you let them go, and you

20  don't remember if he said anything to you?

21      A    That's it.  "I'm legally diving for lobsters, I'm

22  going to release them."

23      Q    You don't recall if he said anything to you?

24      A    No, I don't remember, do not remember.

25      Q    What happened after you let the lobsters go?

1      A    I proceeded in to shore.  He had told me to go in

2    to shore, so I went to shore.  As I let the lobsters go,

3    the four lobsters, the light was on the lobsters, and I was

4    checking for tags.

5      Q    Well, my question was what happened after you let

6    the lobster go.  You indicate that the officer told you to

7    go to the shore, and you did that?

8      A    Yes.

9      Q    What happened then?

10     A    There was an officer on shore.  I did not get out

11   of the water right away because I had fins on and a dive

12   tank on my back, and I had to take the fins off so I could

13   walk up on shore.  I was in the water to my waist.  I had

14   to sit down and take the fins off me.

15     Q    And what did you do after you got into the

16   waist-level water?

17     A    Took my fins off.

18     Q    And you indicated that there was one police

19   officer on the shore at that time?

20     A    I put the dive light with the gauge and the lens

21   in the dive bag with the fins in the dive bag and the mask

22   in the dive bag.

23     Q    My question to you, though, was you indicate that

24   as you were getting to the shore there was one police

25   officer on the shore.

NIZIANKIEWICZ & MILLER

41

```
 1        A    Correct.

 2        Q    Okay.  And then you put all these materials into

 3    your bag?

 4        A    Before I entered the shore.

 5        Q    Okay.  And then what happened?

 6        A    I entered the shore.

 7        Q    Okay.

 8        A    There was an officer standing on the shore.

 9        Q    Do you know the name of the police officer

10    standing on the shore?

11        A    He has gray hair, curly, older guy, heavier set,

12    big face, big belly, biggish kind of belly.  Older guy, in

13    his -- older than 40 years of age.

14        Q    What happened when you got to the shore?

15        A    He grabbed my arm and started shaking me, shoved

16    me into the rocks to my left of the wall.

17        Q    Had this officer said anything to you as you were

18    approaching the shore or as you were putting all these

19    materials into your bag?

20        A    No.

21        Q    He never said anything?

22        A    Not that I remember.  I don't remember him saying

23    anything.

24        Q    Okay.  And then what happened?

25        A    The other officer that was on the rock wall came
```

NIZIANKIEWICZ & MILLER

1    to the shore.

2        Q    And then what happened?

3        A    Then I proceeded up the beach with my tank.  I

4    believe it was still on my back with the BC, the fins, the

5    mask, the dive light, everything I brought up to the beach

6    in the grassy area by the beach.

7        Q    Okay.  I'm sorry, are you saying that you then

8    walked up the beach to the grassy area?

9        A    Yes.  I set the stuff down in here.  My truck was

10   parked like right here.

11       Q    And where did you -- I'm sorry, where did you set

12   the materials down?

13       A    My truck was parked here.  I sat it down right

14   over here, where that blue car is.  All of my stuff was set

15   there.  I was backed into this area.  I was backed in.  I

16   backed in with my truck.  I didn't park that way, backed

17   in.  Where his headlights are was the trunk to my truck,

18   the tailgate to the truck.

19       Q    So you walked from the beach all the way back to

20   the truck and put the stuff on the grass?

21       A    No, not all the way.  I walked from my truck to

22   the beach, which is approximately a minute-and-a-half walk,

23   a minute walk from my truck to the beach.  Not even a

24   minute.  Maybe half a minute.  Sixty seconds.

25       Q    Okay.  Are you talking about when you first

1    arrived that's what you did, or are you talking about after

2    you came out of the water?

3        A    After I came out of the water, I set my dive

4    equipment down in the grass by the beach.

5        Q    Okay.  And then what did you do?

6        A    Then there was the other officer that came over

7    and joined that other officer on the beach that was there

8    with a group of other officers.

9        Q    Okay.

10       A    They were all screaming and hollering.  All the

11   officers were very loud and very angry.

12       Q    How many officers were there?

13       A    I believe four, four or five officers.

14       Q    Okay.  Do you mean for four or five in total or

15   four or five including the two that we already talked

16   about?

17       A    Peckham, Carr, and there was two other officers

18   that were there that I -- that were involved.  One guy with

19   black hair, with a thin, narrow beard, with a flattop

20   haircut; and there was a guy with gray, curly hair, the

21   older guy, the heavyset guy that was on the beach, he was

22   there.

23       Q    Well, other than the two.  I know you indicated

24   the older gentleman with the curly hair was on the beach,

25   and then you indicated the thin officer who was on the

1        A    The guy with the gray hair, with the curly hair,

2    had ahold of my arm and was shaking me, my right arm, my

3    right biceps muscle, was shaking me.  The officer in front

4    of me was with black hair and a black, thin mustache, with

5    a -- like a beard, thin beard that comes down along his jaw

6    line.  He was making erratic movements and screaming very

7    loud and getting right in my face and making sudden

8    movements, provoking a fight with me, the guy with the

9    black hair.

10       Q    When you say he was making erratic movements, what

11   do you mean by that?

12       A    Sudden movements, sudden movements, like had his

13   arms down to his side, up like this, like trying to provoke

14   a fight, trying to get me to fight them.

15       Q    Okay.  I just want to back up quickly for a

16   minute.  You said that when you came out of the -- that the

17   officer on the wall instructed you to come out of the

18   water, right?  The thin gentleman that was standing on the

19   rock wall indicated that you should come out of the water?

20       A    Yes.

21       Q    Okay.  And then you said when you came out of the

22   water, the older officer with the curly gray hair grabbed

23   you?

24       A    Grabbed my arm.

25       Q    Were the officers instructing you to exit the

1   water or put your hands up or anything of that sort?

2       A    No, no.

3       Q    Okay.  And this officer who was down by the shore,

4   who grabbed your arm, was it the same one who was in the

5   grassy area that had a hold on you, you indicated?

6       A    I'm not sure if it was.  There was another younger

7   officer next to the guy on the wall, around in that area,

8   back and forth from the beach to the guy on the wall.  He

9   joined up when I got on the shore.  He was around in that

10  area.  I'm not sure if he was there or -- when I came up

11  from the beach, I noticed that Jeff was getting put against

12  the cop car over in this area.  There was a cop car parked,

13  in Exhibit 5, parked over in here, and I asked, "Why are

14  you arresting Jeffrey Menard?"  And they had said, "We'll

15  think of something."

16      Q    Who did you ask?

17      A    One of the officers at the time.

18      Q    What did he look like?

19      A    A younger guy, not as tall as Peckham.  Not as

20  tall as the guy on the wall.

21      Q    Okay.  What happened after you were standing in

22  the grassy area?

23      A    I had kept trying to tell the officers that I was

24  legal and that I have proper documentation right -- they're

25  looking right at the Connecticut Fish plate in the

1  windshield of the truck, so I had told them that I'm going

2  to get the keys and get the stuff out of the truck.  I

3  don't think I locked the truck, though.  The windows were

4  down.  I didn't carry keys with me because I was in the

5  ocean, and I didn't want to lose the keys, and they could

6  puncture the BC, so I didn't have the keys on me.

7       Jeff was on shore, and he was in full view of the

8  truck or around by the truck and the shore, but I believe

9  the windows were down.  I reached in and got the paperwork

10 for the -- that I was legally to dive, and I took also at

11 the same time my driver's license, registration, insurance

12 out of the glove box and trunk.

13     Q    So at some point from being in the grassy area,

14 you went over to the truck to provide the officers with

15 your permits and licenses?

16     A    Correct.

17     Q    Okay.  Did any of the officers walk over to the

18 truck with you?

19     A    Yes.  I was right next to the truck in the grassy

20 area.  The truck was right next to where I was.  Here is

21 where my truck was, and there's the grassy area right where

22 that car is.

23     Q    Okay.  Just -- in the picture that you're

24 referring to, Defendants' Exhibit 6, is the beach area on

25 the other side of this grassy area that's not shown on the

1      A      To the left.

2      Q      Okay.

3      A      To the left, not behind.  To the left.

4      Q      What happened after you got to the truck?

5      A      I had showed the police officers my driver's

6  license, the insurance, the registration, Connecticut State

7  lobster license and permit.

8      Q      Okay.  And what happened after you showed them the

9  docks?

10      A      They got very upset, the police officers.

11      Q      How do you know they got very upset?

12      A      They were being very aggressive and very loud.

13      Q      How were they being aggressive?

14      A      After I had showed them the permits, Peckham,

15  Officer Peckham was very out of control, and Officer Carr

16  was kind of agreeing with him.  They were very, very, very

17  upset that I had permits and was legally diving; and I had

18  told them that this is a shoreline public access area, and

19  I'm not doing anything wrong, and they kept saying that I

20  was poaching or doing something illegal.

21      Q      You said they were being aggressive.  How were

22  they being aggressive?

23      A      Grabbed me and threw me against the police

24  cruiser, opposite of where my truck was parked.  They were

25  parked by the green dumpster.  They were parked -- my truck

NIZIANKIEWICZ & MILLER

1   was parked here.  They were parked like right here.  I

2   backed in there, so my -- the hood of my truck was facing

3   out.  The permits, license, everything was on the hood of

4   the truck.  The officer's car was parked in front of my

5   truck, roughly 12 to 13 feet away from the front of my

6   truck, the hood of my truck.  They threw me against the cop

7   car.

8        Q    Who threw you against the cop car?

9        A    One of the police officers.  They were behind me,

10  and they threw me against the cop car.  And at that time I

11  had a dive knife on me on my leg, strapped to my right leg,

12  the inside of my leg.  They had taken the dive knife out of

13  the sleeve that was in my leg.  I had told them that there

14  was a weapon there, and they had taken it.  I use that in

15  case of an emergency.  Just in case I get tangled in debris

16  in the ocean, I can use a tool to get out.

17       Q    You indicated that the officer grabbed you and

18  threw you against the cruiser.  Do you know what the

19  officer looked like or any type of description of him?

20       A    There was a number of officers around me.  I

21  believe four or five at the time.  At that time a

22  supervisor, "Town of Stonington Supervisor" on the side of

23  the car, had shown up; and I was against the cop car, and

24  my hands were out, and the cop told me "Spread 'em wide."

25            So I spread my legs real wide.  They got the

```
1    knife.  They were still frisking me down, and the

2    supervisor car had showed up, and I had -- he had got out

3    of the car and came towards where the officers were around

4    me by the car.  It said "Curioso" on his name tag, on his

5    uniform.

6         Q    Is this the person you believe was a supervisor?

7         A    It said "Supervisor" on the side of the cop car in

8    red letters, "Supervisor."

9         Q    And you read his tag; it said "Curioso" on it?

10        A    On his uniform, "Curioso."  I had told Lieutenant

11   Curioso that I was legal, I have the permits on the hood of

12   the car, and explained to him that I was diving for

13   lobsters and I have a permit to dive; and he had looked

14   over the information on the hood of my S-10.  After he read

15   the information, he had called in to dispatch and did a

16   check.

17        Q    How do you know that he called dispatch?

18        A    I could kind of hear some talking about me over

19   the CB.  I was against the cop car.  I could hear something

20   on the CB about my name.  They were doing a check.

21        Q    How do you know that they were doing a check?

22        A    'Cause I heard my name over the CB.  They were

23   checking things out.

24        Q    Okay.  So it was just based on hearing your name?

25        A    That, and about where we were.  It was a location
```

NIZIANKIEWICZ & MILLER

1    of Water Street, Stonington Borough, by the town docks, I

2    heard on the CD.  He had told the officers to let me go, I

3    am totally legal, okay?  He then proceeded back into his

4    car and left the scene, very fast.

5        Q    Okay, and then what happened?

6        A    He left the scene, and -- well, before he left the

7    scene, Peckham had said that he has a beef with me, and

8    then he left the scene very fast; but he left the scene,

9    and they were very upset.  Peckham himself didn't say he

10    had a problem with me, it was his worker, one of his -- the

11    guy that drives with him in the car, co-worker or

12    something.

13        Q    Okay.  First you said Peckham said it, then you

14    said it wasn't him.

15        A    No, I didn't say that.

16        Q    You said, "Peckham said he had a beef with me."

17        A    No, the officer says "Peckham's got a beef with

18    him" to Curioso.  He said that to Curioso.  One of the

19    officers said, "Peckham has a beef with him," and Curioso

20    left, sped out of there.  After he left, they got very

21    upset.  I got hit with lights on this side.  My arms were

22    shaken.  They grabbed my wrists and forced my arms way

23    behind, up behind my back, and they put handcuffs on me

24    very, very tight.  They were very tight, and I told them

25    that they got them on way too tight.  My hands were turning

1  purple.  And there was an officer behind me, punching me

2  and hitting me with the flashlight.

3      Q    What did the officer look like?

4      A    I can't describe -- I don't remember.  It was a

5  couple officers there.  One of the officers that had me

6  against the cop car had the flashlight and, you know, was

7  doing something kind of weird with it; but I don't really

8  want to get into detail on that, but I was upset.

9      Q    Well, what was the officer doing?

10     A    He had the flashlight, and it's like he was going

11 to try to screw me with the light.

12     Q    What do you mean by that?

13     A    Shove the light into a private area, buttocks.

14     Q    Do you know what that officer looked like?

15     A    No.  I then had the cuffs on tight and got shoved

16 into the back of the cop car, and I was bleeding.  There

17 was blood on me, and I wasn't sure where it was coming

18 from, and I could hear in there them doing the background

19 check, and I could hear them notify DEP.  And DEP said that

20 the plate is legal, that they were not coming down; there

21 are no lobsters, I had let them go, they were not coming

22 down.

23          And as I was in the cop car, the group of officers

24 that were standing in area -- in Exhibit 7 were standing

25 around in a circle, looking at the dive light, holding it

1    up and kind of turning it a little and all looking at it,

2    and they were talking, and the officer came back to the

3    car, the guy with the gray hair, curly hair; and I told him

4    that the handcuffs were on very, very tight.  And I was

5    sitting in the back of a cop car in a plastic -- hard

6    plastic seat, almost sitting on my wrists with the cuffs

7    on, and I repeatedly told the officer that the handcuffs

8    were on too tight.

9            And he asked me where did I want the vehicle

10   towed.  I says, "I don't want it towed."  I says, "Can't

11   you just leave it here?"  I says, "This is a public parking

12   lot."

13           He says, "Nope, we're towing the vehicle.  The

14   lobstermen or the people at the dock are upset.  We're

15   towing the vehicle.  We do not want to be responsible for

16   your truck."

17           So I watched as they were going to tow the

18   vehicle.  In the meanwhile, while I was sitting in the cop

19   car, there was a lot of civilians in the area that were

20   standing by in a circle, looking by my truck; and there was

21   a lot of people around that had congregated at the time the

22   supervisor showed up and I was in the cop car.  To this

23   area, to the right by the dumpster, there was a group of

24   people there, and they were all talking and talking with

25   the police.

1    Q    What happened after they told you they were going

2  to tow the car?

3    A    I told them I really didn't want the vehicle

4  touched.  I asked them what I'm being arrested for, and he

5  still didn't tell me.  And I says, "Well, what's Jeff being

6  arrested for?" and he wouldn't tell me.  So I'm still in

7  the cop car.  I've been in there for a while.  My wrist is

8  still sore.  The car was running.

9           I watched a wrecker show up, Brown Auto, and they

10  had hooked up the cables to the truck, and I had told the

11  officer in the car that the cuffs were on tight again, and

12  there was a bunch of people around my truck.  I told them

13  to -- told him to get -- secure my truck, that the

14  equipment is very expensive.  And I says, "I do not want

15  none of the equipment stolen.  I paid a lot of money for

16  it, and I don't want any of the stuff lost or damaged."  I

17  says, "I'd rather have the equipment put inside my truck,

18  okay?"

19           The windows were down, I believe, still, and the

20  equipment was put in the truck; but before they put the

21  equipment in, there was people around here from the dock

22  area.  I told them I wanted the truck secure before it's

23  towed, and they were searching through the truck.

24    Q    Who was searching through the truck?

25    A    One of the officers.

NIZIANKIEWICZ & MILLER

1    Q    What did he look like?

2    A    I'm not too sure.  It had another vehicle parked

3    in front of that vehicle.  Now he had moved his vehicle

4    that I was in, the cruiser.  He had moved the vehicle up to

5    this area, away from my truck, pointing in that direction,

6    where I was constantly looking back at my truck.  I kept

7    telling him the cuffs were on tight, over and over and over

8    again, "Can you loosen the cuffs?"

9    Q    What happened after your truck was towed?

10   A    After they towed the truck, I watched Jeff in the

11   cop car go to the station, and the guy with the gray hair

12   floored out of there and spun off at excessive speed out of

13   here and then out of the entranceway and to the police

14   station.

15   Q    Which officer took you to the police station?

16   A    The gray-haired guy with gray hair.

17   Q    The one --

18   A    Curly.

19   Q    Okay.  What happened after you got to the police

20   station?

21   A    I still had the wet suit on, and the cuffs were

22   still on me very, very tight.  And at the police station, I

23   told them, "Can you please loosen the cuffs?"  I says, "I

24   can't get the wet suit off," because it was a Farmer John

25   wet suit.  It was a black wet suit.

NIZIANKIEWICZ & MILLER

1            I said I cannot get the wet suit off at the police

2    station.  He wanted me to take the wet suit off in a

3    holding cell, and I says, "I cannot.  The cuffs are on way

4    too tight."  So he loosened the cuffs, and I showed him my

5    hands were completely purple and tingling and itching, and

6    I had blood on me.  I showed him the blood.

7        Q    Do you know the name of the police officer?

8        A    I can recognize him in a photo.

9        Q    Well, what does he look like?

10       A    I can recognize all the police officers from

11   photos, which I have not been supplied any photos of the

12   Stonington Police Department.

13       Q    Well, my question --

14       A    Since this date.

15       Q    My question was what did this particular officer

16   look like.

17       A    Gray hair, kind of curlyish, heavyset guy, a

18   little bit of a belly to him, older, older officer.

19       Q    And then what happened?

20       A    Then I was at the police station.  I notified the

21   officer that, you know, I was bleeding.  He took the cuffs

22   off me in the holding cell and closed the door and told me

23   to get undressed from the wet suit.  And I had a pair of

24   shorts on under the wet suit.  They're like very thin

25   swimming shorts.

NIZIANKIEWICZ & MILLER

1   the bed for a long time, and it was a very long time, and

2   we left. I left the cell. Jeff had already -- they

3   already interrogated Jeff over and over again, kept trying

4   to say -- having him say I did something wrong. They kept

5   trying over and over and over again, "He's doing something

6   wrong, he was poaching, he was breaking the law somehow."

7        Jeff had went home, and I asked the officer that

8   before Jeff left, that why didn't Jeff give me a ride back,

9   because I live close to him; and he said he already left

10  for home and that Jeff was mad at me, which wasn't true.

11  He wasn't mad at me.

12       Q    Were you discharged at some point? Were you let

13  go?

14       A    Yes. It was around 3:00, 3:30 in the morning. It

15  was very early in the morning, and they wouldn't let me use

16  the phone at all in there. And finally, after I was

17  fingerprinted and fingerprinted and the dive stuff, I got a

18  receipt for the stuff that they had taken. I think it was

19  a wallet and the suit that I -- the wet suit that I took

20  off in the holding cell. They gave me a list of items that

21  were returned to me, then I was allowed to make the call.

22       And I called my mother, and my mother came down,

23  and they gave her directions to get there. My mother came

24  down and picked me up. I was waiting out in front of the

25  Stonington Police Station, getting bit up by mosquitos,

64

```
 1              The Fourth Amendment says that "The right of the
 2    people to be secure in their persons, houses, papers, and
 3    effects, against unreasonable searches and seizures, shall
 4    not be violated, and no warrants shall issue, but upon
 5    probable cause, supported by oath or affirmation, and
 6    particularly describing the place to be searched, and the
 7    persons or things to be seized."
 8        A     Um-hum.
 9        Q     Can you tell me what you believe the defendants
10    did to violate that Fourth Amendment right?
11        A     Searched my S-10 pickup truck without probable
12    cause or without a warrant.
13        Q     How do you know that the police officers did not
14    have probable cause?
15        A     Because I supplied proper documentation to the
16    officers upon exiting the dive.
17        Q     Other than the search of your vehicle, what else
18    do you believe the police officers did to violate your
19    Fourth Amendment rights, or what other ways do you think
20    they did that?
21        A     Roughed me up and used force against me and
22    handcuffed me excessively tight with handcuffs and one of
23    the other officers doing lewd conduct.
24        Q     What lewd conduct are you referring to?
25        A     The flashlight.
```

1      A    I wanted the captain to be aware of and show him

2   the damage that his officers had done to me on June 29,

3   2001.

4      Q    Okay.  And you voluntarily withdrew that

5   complaint, correct?

6      A    Correct.

7      Q    And why did you do that?

8      A    Jerry Desmond had came to my house on -- I have a

9   date of that, Thursday, July 26, 2001, at 8:45 a.m. I

10   withdrew the complaint because I was harassed by Captain

11   Jerry Desmond, and a Ledyard police officer had escorted

12   him to my residence at 4 Marlene Drive, Ledyard,

13   Connecticut.

14      Q    Okay.  And what is the date that you're claiming

15   Captain Desmond or Jerry Desmond came to your residence?

16      A    Thursday, July 26, 2001.

17      Q    And how were you harassed?

18      A    He wanted to talk with me about an interview at

19   the Stonington Police barracks and wanted to ask me some

20   questions, and he had used the phone to call back or

21   something, and something with the phone, and the phone got

22   slammed down and damaged.  It destroyed the phone, my

23   cordless phone in the kitchen in my house.

24      Q    What do you mean that the phone got slammed down

25   and damaged?

1        A       I have a repair service from SNET --

2        Q       I'm going to stop you and try to get you to focus

3    on the question that I'm asking and be responsive to

4    exactly what I'm asking, okay?  My question is:  When you

5    indicated that the phone got slammed down and damaged, can

6    you explain to me how that occurred?

7        A       Jerry Desmond was using the phone at my house at 4

8    Marlene Drive, Ledyard.  He was talking on the phone, and

9    he got upset and slammed the phone down.  I had told him it

10   would be hard to go against the truth, that I am telling

11   the truth and that if we take it to court, it would be hard

12   for him to fight against the truth.

13       Q       Okay.  I'm just --

14       A       He had got upset and slammed the phone down.  He

15   was talking on the phone.

16       Q       Were you in the room when he was using the

17   telephone?

18       A       Yes.

19       Q       And you're alleging that the slamming down of the

20   phone caused damage to it?

21       A       Correct.

22       Q       Okay.  How were you harassed by Jerry Desmond?

23       A       Intimidation.

24       Q       How were you intimidated?

25       A       By him projecting violent behavior.

NIZIANKIEWICZ & MILLER

1    charges at court.

2         Q    Okay.  You indicated that there was another police

3    officer with Jerry Desmond when he came to your home.

4         A    Yes.

5         Q    Do you know who that was?

6         A    A Ledyard police officer.  I couldn't get his

7    name, but he said he was 12 years on the force with Ledyard

8    Police.

9         Q    So he just identified himself as a Ledyard police

10   officer?

11        A    Yes.  I didn't write down his name tag.  He

12   escorted Jerry Desmond in the house, in my house, my home.

13        Q    Did he stay in your home while you were speaking

14   with Jerry Desmond?

15        A    Yes.  He was in the kitchen area.

16        Q    Okay.  Now, are you claiming any injuries as a

17   result of the incident on June 29, 2001?

18        A    Yes.

19        Q    What injuries you are claiming?

20        A    Physical, emotional, intentional, intentional --

21   intentional damages, psychologically.  They're negligent

22   damages of knowing that arresting me doing something I love

23   to do will cause an exceeding long-term amount of grief and

24   the ability to concentrate and that and physical damage of

25   being bruised and being -- having the police be abusive to

1   me, verbal abuse.

2       Q    Okay.  I'm going to stop you because you're not

3   focusing on injuries, so I'm just going to go through some

4   of the things you've mentioned, okay?

5       A    Okay.  I thought you told me to mention what

6   damage they have done.  I'm describing that.

7       Q    Actual injuries, but I'm just going to go back and

8   focus on some of the things you just told me.  You first

9   indicated physical damage, and you stated bruises.  Are you

10  claiming any other physical injuries other than the

11  bruising?

12      A    I had to see a doctor, Dr. Awwa, an Indian doctor

13  in Stonington.

14      Q    Was that for your physical injury?  Was that for

15  your bruises?

16      A    Mental anguish and emotional distress.

17      Q    Okay.  I don't want to focus on that right now.

18  I'll get to that.  I want to do it in parts.  I want to

19  focus on physical injuries.

20          You're claiming bruising.  Are you claiming any

21  other physical injuries other than bruising?

22      A    Bruises, and that's it.

23      Q    Okay.

24      A    Just the bruises and, you know, that's it as far

25  as physical.

NIZIANKIEWICZ & MILLER

75

```
 1        Q    Okay.  Now, did you treat with any doctors for the
 2   bruising or physical injuries?
 3        A    I called the State Police the morning after
 4   June 29th, I called Montville Troop B and asked them what
 5   to do, that I was assaulted by the police.  I didn't have
 6   money to go to the hospital for treatment.
 7        Q    Okay.  My question to you --
 8        A    So I couldn't do anything.
 9        Q    My question to you is:  Did you treat with a
10   doctor?
11        A    I wanted to, yes.  I wanted to see a doctor.  I
12   did not have the money.
13        Q    Okay.  I'm not asking you about whether you wanted
14   to.  I'm asking you if you did treat with a doctor.
15        A    I tried to, I tried to.
16        Q    What doctor did you try to see?
17        A    I tried to figure a way of getting some kind of
18   insurance through the police, victims-of-violence-type
19   thing, to have them pay for me to see a doctor or
20   something.  I didn't have any money.  I couldn't go to a
21   doctor because I didn't have no insurance or no money.
22        Q    I understand what you're saying.
23        A    I don't know what else you want me to tell you.
24        Q    You indicated you tried to see a doctor.  I want
25   to know what doctor you tried to see.
```

NIZIANKIEWICZ & MILLER

1      A    The emergency room at Backus Hospital.  I was

2  going to go there.

3      Q    Did you actually go to the emergency room?

4      A    No.  My wrist was sore, and my hands were tingly,

5  and I couldn't drive.  My hands the following day were all

6  sore, tingly, red, purple.  I lost sensation in them.  And

7  that's the issue why I called Montville Troop B the day

8  after the incident.

9      Q    But you didn't actually go to the emergency room?

10     A    No, I couldn't drive.

11     Q    Okay.

12     A    The girl I was seeing actually took me to get the

13  truck; and, you know, we couldn't drive.  I couldn't even

14  come up with basically the money to get the truck for the

15  towing fee.

16     Q    Okay.  I don't have a question pending, so if you

17  could just try and limit your responses.

18          You also indicate that you're claiming emotional

19  injuries?

20     A    Correct.

21     Q    Can you tell me what kind of emotional injuries --

22     A    I lost my job at work.  I had to receive medicine,

23  Clonazepam, C-L-O-N-A-Z-E-P-E-M, 5-milligram tablets, by

24  Dr. Awwa, A-W-W-A; and also I had to receive Paxil,

25  P-A-X-I-L, 10-milligram tablets.  I was scheduled by

NIZIANKIEWICZ & MILLER

1    Dr. Awwa.

2         Q     How did you come to treat with Dr. Awwa?

3         A     I went and called and talked with the secretary

4    and told him the situation and that I need immediate help.

5         Q     Why did you feel you needed immediate help?

6         A     I was very nervous and fearful and confused and

7    going through a lot at that time.

8         Q     When you say "going through a lot," can you be

9    more specific?

10        A     Confused emotionally, no ability to concentrate on

11   anything, just the incident with the police going over and

12   over and over in my head.

13        Q     When you say that you were confused emotionally,

14   what --

15        A     Why they arrested me for no reason.

16        Q     So you were confused about that?

17        A     Correct.

18        Q     Okay.  And you said that you couldn't concentrate.

19   Why were you unable to concentrate?

20        A     My job as a machinist requires concentration, and

21   looking at blueprints and focusing on making a part out of

22   raw material, I could not concentrate on my job due to the

23   arrest by the Stonington Police Department.

24        Q     What about the arrest was preventing you from

25   concentrating?

NIZIANKIEWICZ & MILLER

1     "lack of work" as the reason?

2          A     Correct.

3          Q     Did anyone at TLS tell you that you were being

4     fired because of the arrest?

5          A     It was hinted to me by a friend of mine that the

6     policy there requires that no arrests or any kind of

7     trouble.

8          Q     Did any supervisor at TLS tell you that you were

9     being fired or let go because of your arrest?

10         A     That I can't remember.  They might have, but I

11    can't remember.  I don't know.  I can't remember.

12         Q     Okay.  Now, in your discovery responses, you claim

13    that your earning capacity has been impaired.  Can you tell

14    me what that is based on?

15         A     It is based on that it was hard for me to find

16    work after losing my job there because the field of

17    machining requires the ability to concentrate.

18               Carpentry, the business that I own now, doesn't

19    require as much thinking as is required to as machine.

20    Machining is precise measurements to within half of a

21    thousandths.  The work that I do, I deal with increments of

22    an inch; eighth-inch, three-eighths, quarter-inch.

23    Machining is dealing with fractions of decimals of half of

24    a 16th.  It's more precise, concentrated, a concentrated

25    level is machining.  The business I do now is less

NIZIANKIEWICZ & MILLER

1      Q    Now, when I was asking about your position at

2    TLS -- I'm sorry, do you have a copy of that pink slip that

3    you were referring to?

4      A    Attorney Ed Phillips and Attorney Warren Miller

5    have a copy of the unemployment notice, UC-61 (R8/95).

6      Q    Have you provided your attorneys with a copy of

7    the pink slip?

8      A    Yes.

9         MR. PHILLIPS:  Do you have a copy of it?

10         MS. JORDAN:  No, I don't.

11         MR. PHILLIPS:  Okay.  I'll make sure you have it.

12    BY MS. JORDAN:

13      Q    Now, are you claiming that your injuries you have

14    sustained as a result of this incident have prevented you

15    from or limited you in any way?

16      A    Yes, the ability to concentrate and the ability to

17    trust law enforcement officers.

18      Q    Are there any other ways that you believe that you

19    have been limited because of this incident, other than the

20    concentration and the law enforcement officers?

21      A    Emotional duress, emotional damage from doing

22    something that I love to do, which is scuba dive.  It took

23    85 to 90 percent of the enjoyment out of scuba diving away

24    from me for future dives.  That's it.

25         MS. JORDAN:  Okay.  I have no further questions.

NIZIANKIEWICZ & MILLER

| | | |
|---|---|---|
| 1 | A | No, they did not. |
| 2 | Q | Did they inform you of your rights? |
| 3 | A | No, they did not. |
| 4 | Q | All right. Do you think they had a reason to |
| 5 | | arrest you? |
| 6 | A | No. |
| 7 | Q | Do you think they had a reason to search you? |
| 8 | A | No. |
| 9 | Q | Do you think they had any reason to search your |
| 10 | | vehicle? |
| 11 | A | No. |
| 12 | Q | Were you allowed to call anyone while you were |
| 13 | | under arrest? |
| 14 | A | No, I was not. |
| 15 | Q | Were you able to speak with an attorney while you |
| 16 | | were under arrest? |
| 17 | A | No. |
| 18 | Q | While you were in the custody of Stonington Police |
| 19 | | Department, did you inform them that you were bleeding? |
| 20 | A | Yes. |
| 21 | Q | Did you ask to get medical attention? |
| 22 | A | Yes. |
| 23 | Q | Did they give you any medical attention? |
| 24 | A | No, they did not. |
| 25 | | MR. PHILLIPS: All right. I don't have any other |

NIZIANKIEWICZ & MILLER

CERTIFICATE OF REPORTER

I, HEATHER J. WALSH, A Notary Public duly commissioned and qualified in and for the State of Connecticut, do hereby certify that pursuant to notice there came before me on the 22nd day of May, 2003, the following-named person, to wit:  EDWARD BROWN, who was by me duly sworn to testify to the truth and nothing but the truth; that the witness was thereupon carefully examined upon their oath and examination reduced to writing under my supervision; that this deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney nor counsel for nor related to nor employed by any of the parties to the action in which this deposition is taken and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in this action.

IN WITNESS THEREOF, I have hereunto set my hand and affixed my seal this 13ᵗ day of June, 2003.


HEATHER J. WALSH
NOTARY PUBLIC
MY COMMISSION EXPIRES NOV. 30, 2007

HEATHER J. WALSH
LSR, Notary Public
Lic./Reg. No. 00226